CAMOU v. UNITED STATES.

APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 28. Argued March 16, 1898. — Decided May 31, 1898.

A valid grant was made in this case, which it was not within the power of a temporary dictator to destroy by an arbitrary declaration.

This government discharges its full duty under the Gadsden treaty, when it recognizes a grant as valid to the amount of the land paid for.

ON December 3, 1891, the appellant filed in the Court of Private Land Claims his petition praying to have confirmed to him a certain tract of land situate in the county of Cochise, in the Territory of Arizona, known and designated as the San Rafael del Valle grant. Subsequent proceedings resulted in a trial and a decree in behalf of the government, dismissing the petition and adjudging petitioner's claim and title invalid. The title papers show that on March 12, 1827, Rafael Elias made application to the treasurer general of the state of Sonora for the purchase of "public lands adjacent to the ranch of San Pedro, within the jurisdiction of Santa Cruz, as far as the place called Tres Alamos." On July 1 of that year the treasurer general directed that proceedings be had in accordance with law under the supervision of the alcalde of Santa Cruz. The proceedings appear to have been regular. The survey was of a tract reported by the surveyors to contain four sitios. The property was appraised at $60 a sitio, or $240 altogether. The fiscal attorney approved the proceedings and advised that they "be continued to adjudication according to the forms and requisites in use." At the third auction, on April 18, 1828, the property was struck off to Don Rafael Elias, the petitioner, for the sum of $240. On April 21, the petitioner paid this sum into the treasury. Nothing further was done until April 29, 1833, at which time the then treasurer general of the state of Sonora issued the expediente, or title papers. This expediente opens with this preamble:

" Jose Maria Mendoza, treasurer general of the free, indepen-
dent and sovereign state of Sonora, Greeting :

" Inasmuch as article 11 of the sovereign decree number 70
of the general congress of the union, dated August 4th of
1824, concedes to the states the revenues which in said law
it did not reserve for the federation itself, and one of them
being that derived from the lands within their respective
territories, which in consequence belongs to them, for the dis-
position of which the honorable constitutive congress of the
state that used to be joined of Sonora and Sinaloa enacted
the law No. 30 of May 20th of 1825, as well as the decrees
relative thereto passed by other succeeding legislatures, and
the citizen Rafael Elias, a resident of this capital, having
made due application on the 12th of March of 1827, at the
treasury general that was then of the United States, for the
lands named San Rafael del Valle, located in the jurisdiction
of the presidio of Santa Cruz, which was allowed according to
law on the date of July 1st of the same year, and the peti-
tion of entry, the order for the commission, and the act of
accepting the charge being as follows, to wit ; " and after re-
citing the various steps in the sale closes with this granting
clause :

" In which terms I issue the present title of grant in due
form in favor of the citizen Rafael Elias, his heirs and succes-
sors, delivering it to them for their protection, previous memo-
randum of the same being entered in the proper book.

" Given at the capital of Arispe on the twenty-fifth day of
the month of December of one thousand eight hundred and
thirty-two.

" Attested and signed by me, sealed with the seal of the
treasury general, before the undersigned witnesses of my as-
sistance, with whom I act in default of clerk, there being none,
according to law.

                                    " JOSE MARIA MENDOZA.

" Assistant : LOUIS CARRANCO.
" Assistant : BARTOLO MIRANDA.
" [Seal of the Free State of Sonora; Treasury General.]"

The amount of land within the tract as now surveyed, according to the testimony, is 20,034.62 acres. The petition did not state the area applied for, but as has been seen the survey and appraisement called the tract four sitios, or 17,353.85 acres.

*Mr. Rochester Ford* for appellant.

*Mr. Special Attorney Reynolds* for appellees. *Mr. Solicitor General* was on his brief.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

This grant was made in the name of the state of Sonora and by the proper officer of that state, if it had power to make the grant. The first question, therefore, is as to the power of the state. We held in *United States* v. *Coe*, 170 U. S. 681, just decided, that from and after the adoption of the constitution of 1836 no such power was vested in the separate states. But that case called for no determination of the authority those states possessed prior thereto, and in respect to that matter no opinion was expressed. We have in this case, and that immediately following, *Perrin* v. *United States, post,* 292, elaborate discussions by counsel as to the title to the public lands within the limits of Mexico and the respective rights thereto of the general government and the separate states. On the one hand it is insisted that, as in the case of the thirteen colonies that formed the United States of America, the vacant lands were the property of the states; that as no express cession was made by any Mexican states to the general government the title to those lands remained in the states until at least the formation of the constitution of 1836, and that each state had therefore the absolute right to dispose of all within its own limits. On the other hand, it is said that, prior to the separation of Mexico from Spain, the lands were the property of the king of Spain, that the separation created a new national government which succeeded to all the rights of the prior sovereign, including therein the ownership of all vacant lands. We

deem it unnecessary to review this discussion or attempt to settle the disputed question as to the location of the title. In this expediente the treasurer general refers to "Article XI of the sovereign decree number 70 of the general congress of the union," as conceding to the states the revenues derived from the sale of lands within their respective limits, and upon that and law number 30 of the congress of the state relies as the sources of his power to make the conveyance. The state having undoubtedly vested its authority in the treasurer general, the inquiry comes back to the effect of said Article XI.

Preliminary thereto we must notice these matters :

The constitutive act of the Mexican federation, adopted January 31, 1824, in Articles 5 and 6, declares :

" ART. 5.  The nation adopts for the form of its government a popular representative and federal republic.

" ART. 6.  Its integral parts are free, sovereign and independent states, in as far as regards exclusively its internal administration, according to the rules laid down in this act, and in the general constitution." 1 White's New Recopilacion, p. 375.

On October 4, 1824, a constitution was established. In it Article 49 reads :

" The laws or decrees, which emanate from the general congress, shall have for their object :

" 1.  To sustain the national independence, and to provide for the preservation and security of the nation in its exterior relations.

" 2.  To preserve the federal union of the states, and peace and public order in the interior of the confederation.

" 3.  To maintain the independence of the states among themselves, so far as respects their government according to the constitutive act and this constitution.

" 4.  To sustain the proportional equality of obligations and rights which the states possess in point of law." 1 White, p. 393.

And enumerating in Article 50 the powers possessed by the general congress, subdivision 31 reads :

" To dictate all laws and decrees, which may conduce to

accomplish the objects spoken of in the forty-ninth article, without intermeddling with the interior administration of the states." 1 White, p. 395.

Article 137, defining the attributes of the supreme court, names among others:

" 1. To take cognizance of disputes, which may arise between the different states of the union, whenever there arises litigation in relation to the same, requiring a formal decree, and that arising between a state and one or more of its inhabitants, or between individuals in relation to lands under concessions from different states, without prejudice to the right of the parties to claim the concession from the party which granted it." 1 White, 405.

It cannot of course be pretended that these provisions either operated to transfer the title to vacant public lands from the nation to the respective states or amount to a declaration that the title to such lands is vested in the states. All that can fairly be inferred from them is that the supremacy of the several states in matters of local interest was recognized, and further, that conflicting cessions of lands from different states might be expected and that the settlement of disputes respecting them should be by the supreme court of the nation. These inferences are by no means determinative of the question here presented, and yet it must be conceded that they at least point to some control by the states over vacant lands within their limits, and suggest the exercise by those states of the right to make concessions of those lands.

Two prominent laws of the Mexican nation are the colonization law of August 18, 1824, 1 White, 601; Reynolds, p. 121, and the law in respect to general and special revenues of August 4, 1824. Reynolds, p. 118. White's translation of Articles 1, 2, 3, 10, 11 and 16 of the colonization law, differing slightly from that given by Reynolds, is as follows:

" ART. 1. The Mexican nation offers to foreigners, who come to establish themselves within its territory, security for their persons and property; provided they subject themselves to the laws of the country.

" ART. 2. This law comprehends those lands of the nation,

not the property of individuals, corporations or towns, which
can be colonized.

"ART. 3. For this purpose the legislatures of all the states
will, as soon as possible, form colonization laws or regulations
for their respective states, conforming themselves in all things
to the constitutional act, general constitution and the regula-
tions established in this law."

"ART. 10. The military who, in virtue of the offer made
on the 27th of March, 1821, have a right to lands, shall be
attended to by the states, in conformity with the diplomas
which are issued to that effect by the supreme executive
power.

"ART. 11. If, in virtue of the decree alluded to in the last
article, and taking into view the probabilities of life, the su-
preme executive power should deem it expedient to alienate
any portion of land in favor of any officer, whether civil or
military of the federation, it can do so from the vacant lands
of the territories."

"ART. 16. The government in conformity with the provi-
sions established in this law will proceed to colonize the terri-
tories of the republic."

It is not pretended that the grant in question was made under
this colonization law, and we only refer to it as showing a rec-
ognition by the general government of some authority on the
part of the states in reference to the vacant lands. It will be
seen that while Article 2 speaks of "the lands of the nation,"
Article 3 directs the states to enact colonization laws in con-
formity to the general provisions of the constitution. So that
the actual management of colonization affairs was put within
the control of the states, subject, of course, to the superior
dominion of the general government. Article 10 provides
that military rights to lands, though created by the nation
shall be attended to by the states, thus implying at least that,
for convenience, administration of the vacant lands was en-
trusted to the states. Obviously the thought here was that
there should not be two places in which the administration of
the public lands should be carried on, and so in Article 11 it
was provided that if in the judgment of the nation it was ex-

pedient to grant to a military or civil officer any public lands, it was to be made from vacant lands in the territories. And, finally, in Article 16, as though to separate the administration of the public lands in the states from those in the territories, it is distinctly declared that the national government will colonize the territories of the public. As heretofore said, all this, of course, amounts only to assigning to the states the administration of the vacant lands for purposes of colonization.

The other act to which we have referred, the one which is relied upon by the treasurer general as giving authority for this expediente, is that in reference to general and special revenues. It commences with the declaration that the following belong to the general revenues of the federation, and then in ten articles are named revenues derived from different sources, such as import and export duties, tobacco and powder, etc. The eighth, ninth, tenth and eleventh articles are as follows, Reynolds, p. 118:

" 8. That from the territories of the federation.

" 9. National property, in which is included that of the inquisition and temporal property of the clergy, or any other rural or urban property that belongs, or shall hereafter belong, to the public exchequer.

" 10. The buildings, offices, and the lands attached thereto, which belong, or have belonged, to the general revenues and those that have been maintained by two or more of what were formerly provinces, are at the disposal of the government of the federation.

" 11. The revenues not included in the foregoing articles belong to the states."

The eighth article gives to the national government all the revenues derived from the territories. Obviously the entire management of the affairs of the territories was reserved to the general government, and any revenue derived therefrom passed into the general treasury.

The ninth article is indefinite in that it fails to define what is national property. It assumes that certain things pass within the description of national property, and affirmatively includes within that description the property taken

from the clergy. The language used is broad enough to include all public lands within the limits of the nation, and yet if it was intended to include such lands it would seem scarcely necessary to add the clause including those taken from the clergy. Certain is it that according to our methods of legislation, and our use of language, this article would not be considered as defining the property the revenues from which it assigns to the national government. The tenth article seems to have little significance in this connection, and refers obviously to public buildings and the grounds attached, and not to vacant public lands. While the eleventh article concedes to the states the revenues not included in the foregoing articles, it does not define those revenues, and depends for its scope upon the significance and force of the prior articles. If these articles were all that called for consideration it would be difficult to infer from them that the vacant public lands were given to the states for purposes of sale or for appropriation of the proceeds of such sales. But in the same statute is a provision that "the sum of $3,136,875, estimated as the deficit in the general expenses, shall be apportioned among the states of the federation," and following that is the apportionment. Other sections required delivery by the states every month of their part of the above apportionment and the final adjustment of the amount thereof between the government and the states. Of course this implies that within the limits of the state there were certain matters of revenue reserved, out of which the states were to collect the sums apportioned to them, and to return the same to the general treasury. Subsequent legislation throws light upon the meaning of this revenue law. Thus, on April 6, 1830, a decree was passed, the third article of which is as follows:

" The government shall have power to appoint one or more commissioners to visit the colonies of the frontier states, to contract with their legislatures for the purchase, in the name of the federation, of the lands they may consider suitable and sufficient for the establishment of colonies of Mexican and of other nations, to enter into such arrangements with

the colonies already established as they may deem proper for the security of the republic, to see to the exact compliance with the contracts upon the entry of new colonists, and to examine as to how far those already entered into have been complied with.

"4. The executive shall have the power to take the lands he may consider suitable for fortifications and arsenals, and for new colonies, and shall give the states credit for their value on the accounts they owe the federation." Reynolds, p. 148.

The language of this decree is very significant, and clearly recognizes some title in the states, for why should commissioners be authorized to contract with the legislatures of the states for the purchase of lands which belonged to the nation? It also clearly recognizes the right of the states to sell these vacant lands and apply the proceeds in settlement of the demands made against them by the general apportionment of the revenue law of 1824. It declares that the executive may take the lands he considers suitable for fortifications, arsenals and for new colonies, and at the same time provides that he shall give the states credit on the amount they owe the confederation. But why should any credit be given if these lands so taken by the executive were the property of the nation and the states without authority to sell them or receive the proceeds of sales? If during all these years the lands were the property of the nation, were to be held and sold only by the nation, and the proceeds thereof to be accounted for directly to the nation, why should it be decreed that if the nation takes any part of them for arsenals and other public purposes, credit for the value thereof is to be entered upon the amounts due by the states to the nation? We find it difficult to escape the force of this decree of 1830. It indicates that although the language of the revenue decree of 1824 is indefinite, and does not in terms name vacant public lands, yet both the nation and the states understood that its effect was to grant authority to the states to sell such lands and appropriate the proceeds in settlement of the amounts charged against them by the nation. We see no

other way in which to give reasonable force to the language of this decree of 1830, and it must be held to be a national interpretation of the revenue decree of 1824.

But we are not limited to this authoritative national exposition of the meaning of the revenue law of 1824. The testimony in the several cases of a similar nature now before us, including therein the reports of the officers of this government sent to examine the archives of Mexico, discloses that the state of Sonora, at least, assumed that the revenue act of 1824 authorized its disposal of the vacant public lands, and acting on that assumption did in a multitude of cases make sales thereof. In this connection it may be observed that the constitution of the state of Sonora, or State of the West, declares, article 47, that the right of selling lands belongs to the state. This constitution bears date May 11, 1825. Law No. 30 of that state, of May 20, 1825, the law referred to by the treasurer general in the expediente, recites that " the congress has seen fit to decree the following provisional law for the purchase of the lands of the state." Subsequent legislation of the state is in the same line.

Further, sections 8 and 9 of article 161 of the national constitution of 1824 made it the duty of each Mexican state —

" To present annually to each one of the houses of the general congress a minute and comprehensive report of the amounts that are received and paid out at the treasuries within their limits, together with a statement of the origin of the one and the other, and touching the different branches of agriculture, commercial and manufacturing industries," etc.

And also —

" To forward to the two chambers (of the federal government) and when they are in recess, to the council of the government, a certified copy of their constitutions, laws and decrees."

It may be assumed that these requirements of the national constitution were complied with, and that the constitutions, laws and decrees of the state and the proceedings had in reference to these several sales of land were reported to the congress of the nation. We find no act of that congress set-

ting aside such legislation or sales. This is significant, and it is not inappropriate to refer to *Clinton* v. *Englebrecht,* 13 Wall. 434, 446, in which it was said:

"In the first place, we observe that the law has received the implied sanction of congress. It was adopted in 1859. It has been upon the statute book for more than twelve years. It must have been transmitted to congress soon after it was enacted, for it was the duty of the secretary of the territory to transmit to that body copies of all laws, on or before the first of the next December in each year. The simple disapproval by congress at any time would have annulled it. It is no unreasonable inference, therefore, that it was approved by that body."

We are not insensible of the fact that the provisions of the act of September 21, 1824, creating the office of commissary general, an act which we had occasion to consider in *Ely's Administrator* v. *United States, ante,* 220, seem to make against the idea of the administration of vacant lands by the states, and it is difficult to work out from all the statutes a consistent, continuous and harmonious rule. We must in each case endeavor to ascertain what the Mexican government recognized as valid, and when that is done the duty of respecting and enforcing the grant arises. Other matters are referred to by counsel in their briefs, but it would needlessly prolong this opinion to refer to them. Our conclusion is that at the time of these transactions the several states had authority to make sales of vacant public lands within their limits, and that such sales, unless annulled by the national government, must be considered as grants to be recognized by this Government under the terms of the treaty of 1853.

We pass, therefore, to a consideration of the effect of the decrees of Santa Anna. The lands in controversy were obtained from Mexico under what is known as the Gadsden treaty of 1853. This treaty was concluded on December 30, 1853, and ratified June 30, 1854. At the time of the treaty Santa Anna was supreme executive and virtually dictator in Mexico, and the treaty was negotiated with him. On November 25, 1853, only about a month before the signing of the Gadsden treaty, he published this decree:

"ART. 1. It is declared that the public lands, as the exclusive property of the nation, never could have been alienated under any title by virtue of decrees, orders and enactments of the legislatures, governments or local authorities of the states and territories of the republic.

" 2. Consequently, it is also declared that the sales, cessions or any other class of alienations of said public lands that have been made without the express order and approval of the general powers, in the manner prescribed by the laws, are null and of no value or effect.

" 3. The officials, authorities and employés upon whom devolve the execution of this decree, shall proceed as soon as they receive it to recover and take possession in the name of the nation, of the lands comprehended in the provisions of article 1, and that may be in the possession of corporations or private individuals, whatever may be their prerogatives or position.

" 4. The judicial, civil or administrative authorities shall admit no claims of any kind nor petitions whose purpose is to obtain indemnification from the public treasury for the damages the unlawful holders or owners may allege under the provisions of the preceding article ; and they shall preserve their right only against the persons from whom they have the lands they are now compelled to return."   Reynolds, p. 324.

On July 5, 1854, he published another decree, which was even more specific, containing these provisions :

" ART. 1. The titles of all the alienations of public lands made in the territory of the republic from September, 1821, till date, whether by the general authorities or by those of the extinguished states and departments, shall be submitted to the revision of the supreme government, without which they shall have no value and shall constitute no right of property.

\*        \*        \*        \*        \*

" 5. The alienations of public lands, of whatever nature they be, that have been made by the authorities and officials of the departments without the knowledge and approval of the general government, during the epoch when the central system was in force in the republic, are void.

" 6. Those made. by said authorities in the epoch of the extinguished federation are likewise void ; provided they were not made for the purpose of extending and promoting colonization, which was the purpose proposed by the law of August 18, 1824.

" 7. Grants or sales of lands made to private individuals, companies, or corporations under the express condition of colonizing them, and the holders of which have not complied therewith in· the terms stipulated, are declared to be of no value." Reynolds, p. 326.

Subsequently, on December 3, 1855, and after Santa Anna had been deposed and while Juan Alvarez was president *ad interim,* a decree containing the following provisions was entered :

" ART. 1. The decrees of November 25, 1853, and July 7, 1854, which submitted to the revision and approval of the supreme government the grants or alienations of public lands made by the local governments of the states or departments and territories of the republic from September, 1821, to that date, are repealed in all their parts.

" ART. 2. Consequently, all the titles issued during that period by the superior authorities of the states or territories under the federal system, by virtue of their lawful faculties, or by those of the departments or territories, under the central system, with express authorization or consent of the supreme government for the acquisition of said lands, all in conformity with the existing laws for the grant or alienation respectively, shall for all time be good and valid, as well as those of any other property lawfully acquired, and in no case can they be subjected to new revision or ratification on the part of the government." Reynolds, p. 329.

And again, on October 16, 1856, a decree was passed while Ignacio Comonfort was president, the first article of which is as follows :

" ART. 1. The decrees of November 25, 1853, and July 7, 1854, are void." Reynolds, p. 331.

The Court of Private Land Claims was divided. Three of the justices were of opinion that as this Government recog-

nized Santa Anna in negotiating with and purchasing from him the territory within the Gadsden purchase, the courts must also recognize his declarations in respect to titles as authoritative, citing in support of these general propositions Wheaton's International Law, secs. 31 and 32, and Halleck's International Law, pages 47 and 62. Without questioning the general propositions laid down in these authorities, we are of opinion that too much weight was given to the decree of Santa Anna of November 25, 1853, the only one announced before the cession, and that that decree should not be considered as absolutely determinative of individual rights and titles.

While it is true that practically Santa Anna occupied for the time being the position of dictator, it must not be forgotten that Mexico, after its separation from Spain in 1821, was assuming to act as a republic subject to express constitutional limitations. While temporary departures are disclosed in her history, the dominant and continuous thought was of a popular government under a constitution which defined rights, duties and powers. In that aspect the spasmodic decrees made by dictators in the occasional interruptions of constitutional government should not be given conclusive weight in the determination of rights created during peaceful and regular eras. The divestiture of titles once legally vested is a judicial act. In governments subject to ordinary constitutional limitations a mere executive declaration disturbs no rights that have been vested, and simply presents in any given case to the judicial department the inquiry whether the rights claimed to have been vested were legally so vested. Undoubtedly this Government dealing with Mexico, and finding Santa Anna in control, rightfully dealt with him in a political way in the negotiation of a treaty and the purchase of territory, and the judicial department of this Government must recognize the action of its executive and political department as controlling. But when the courts are called upon to inquire as to personal rights existing in the ceded territory, a mere declaration by the temporary executive cannot be deemed absolutely and finally controlling. It is un-

necessary to rest this case upon the fact disclosed that these decrees of Santa Anna were immediately thereafter revoked. It is not significant that the substance of them was thereafter reëstablished. We are compelled to inquire whether prior to such decree there were rights vested, rights which the Mexican government recognized, and then determine whether those rights were by such decree absolutely destroyed.

Turning to the decree of November 25, 1853, the first and second articles are mere declarations of law. The third article directs the officials to proceed to the execution of the decree and to recover and take possession of the lands coming within the scope of the prior articles. It does not appear that any steps were taken by any officials to carry into execution this decree. Whether this particular grant came within the scope of the two declarations of law was a question to be considered and determined. On that question the grantee never was heard. There never was a judicial adjudication that his grant came within the scope of the first two articles. He was never dispossessed. His property was never taken possession of. It is going too far to hold that the mere declaration of a rule of law made by a temporary dictator, never enforced as against an individual grantee in possession of lands, is to be regarded as operative and determinative of the latter's rights.

As for the reasons heretofore mentioned, we are of opinion that a valid grant was made in this case, we think this arbitrary declaration by a temporary dictator was not potent to destroy the title. The decree of the Court of Private Land Claims must therefore be reversed. As shown by the statement of facts the survey of the land claimed in the petition is in excess of the four sitios granted and paid for. While the excess is not so great as in many cases, yet we think the rule laid down in *Ely's Administrator* v. *United States, ante,* 220, should control, and that this Government discharges its full duty under the treaty when it recognizes a grant as valid to the amount of land paid for.

*The decree of the Court of Private Land Claims will be reversed, and the case remanded for further proceedings.*