PEOPLE OF PORTO RICO et al. v. AMERICAN R. CO. OF PORTO RICO.

(Circuit Court of Appeals, First Circuit.    December 4, 1918.)

No. 1321.

1. TERRITORIES ☞20—INSULAR POSSESSIONS—PORTO RICO—POWERS OF LEG-
ISLATIVE ASSEMBLY.
   Under Organic Act of Porto Rico (Act Cong. April 12, 1900) establishing
a civil government, and which creates a legislative assembly, with au-
thority extending to "all matters of a legislative character not locally
inapplicable" (section 32 [Comp. St. 1916, § 3781]), the exclusive control of
the Interstate Commerce Commission over railroad rates did not extend
to local tariffs of the intra-island railroads of Porto Rico, but such con-
trol was vested in the legislative assembly.

2. STATUTES ☞56—INSULAR POSSESSIONS—PORTO RICO—VALIDITY OF LEG-
ISLATIVE ACTS.
   Under Organic Act of Porto Rico (Act Cong. April 12, 1900) § 31 (Comp.
St. 1916, § 3780), requiring all laws enacted by the legislative assembly
to be reported to Congress, which reserved the power to annul the same,
it is to be presumed, in the absence of proof to the contrary, that a law
was so reported and that it was acquiesced in by that body.

3. CARRIERS ☞1—POWER—REGULATION OF RATES—STATUTE OF PORTO RICO.
   Act Porto Rico March 12, 1908, § 7 (Comp. St. 1913, § 344), making it un-
lawful for a railroad company to charge other or different rates than
those specified in a tariff schedule approved by the executive council,
was within the powers of the legislative assembly and valid.

4. CARRIERS ☞18(6)—VIOLATION OF REGULATIONS—RATES—INJUNCTION.
   The violation by a railroad company of a statute of Porto Rico regu-
lating rates affords ground for injunctive relief, and the federal District
Court for Porto Rico, where it has jurisdiction of the parties, has power
to grant such relief.

Appeal from the District Court of the United States for the District
of Porto Rico; Peter J. Hamilton, Judge.

Suit in equity by the People of Porto Rico and others against the
American Railroad Company of Porto Rico.    Decree for defendant,
and complainants appeal.    Reversed.

Col. Edward S. Bailey, Asst. Judge Advocate General, of Washing-
ton, D. C. (Howard L. Kern, Atty. Gen., on the brief), for appellants.
Francis H. Dexter, of San Juan, P. R., for appellee.

Before BINGHAM and JOHNSON, Circuit Judges, and AL-
DRICH, District Judge.

ALDRICH, District Judge.    [1] The central and substantial ques-
tion in this case is whether, at the time in question, the supposed regu-
latory provision of section 7 of an act of the legislative assembly of
Porto Rico dated March 12, 1908, and entitled "Public Service Corpo-
rations" (Comp. Stat. Porto Rico, p. 72), was operative and prohibi-
tive of railroad rate raising without the consent or approval of the
executive council of Porto Rico, and we think it was.

The Act of Congress of April 12, 1900, c. 191, 31 Stat. 77, entitled
"An act temporarily to provide revenues and a civil government for
Porto Rico, and for other purposes," now known as the Foraker Act,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
254 F.—24

and recognized as the Organic Law of the island, created a local legislative assembly, to consist of two houses, and designated the two houses thus constituted as "the legislative assembly of Porto Rico," and provided the manner in which the members should be elected.

As Congress might well do, under its plenary power in respect to territories and possessions of the United States (Clinton v. Englebrecht, 13 Wall. 434, 441, 20 L. Ed. 659; National Bank v. Yankton County, 101 U. S. 129, 25 L. Ed. 1046; Mormon Church v. United States, 136 U. S. 1, 10 Sup. Ct. 792, 34 L. Ed. 481; Dorr v. United States, 195 U. S. 138, 24 Sup. Ct. 808, 49 L. Ed. 128, 1 Ann. Cas. 697), it broadly and plainly delegated local legislative powers to the assembly which it thus created. The purpose is gathered from sections 8, 14, 15, 27, 32 (Comp. St. 1916, §§ 3755, 3762, 3763, 3776, 3781), and from the rather general scope of what was intended as an organic law, creating a temporary civil government to be administered under the auspices of the United States, and we think the plan of government contemplated that the legislative assembly which it created should take the initiative in respect to questions like those relating to local freight rates. Indeed, through section 32 of the act it is expressly declared "that the legislative authority herein provided shall extend to all matters of a legislative character not locally inapplicable."

In a period in which considerations of public policy required government restraint and control in respect to railway rates, and acting under supposed delegated authority to legislate with respect to such a subject, the assembly of Porto Rico through the act of March 12, 1908, which was an act for the regulation of public service corporations in Porto Rico, through section 7, declared that—

"It shall be unlawful for any public corporation to charge, demand, collect or receive a greater or less compensation for any service performed by it than is specified in the tariff or schedules, rules and regulations approved by the executive council." Comp. Stat. Porto Rico, p. 72.

The railroad in question was a New York corporation and was operating a railway in Porto Rico, and although it had theretofore submitted its schedules to the executive council, rather than to the Interstate Commerce Commission, and had been going along under a schedule of freight rates which had been approved by the executive council of Porto Rico, without authority from that body, and while its petition for permission and authority to increase its schedule of rates was pending before it, put into effect a schedule of freight tariffs for the transportation of sugar cane and its products, which increased the rates twenty per cent. above the schedule which had been approved and under which it had been operating. And the Porto Rican executive council thereafter, in the pending proceeding of the railroad for permission to increase, ordered that no change should be made without its approval.

Upon the general question as to what of the general laws, if any, and upon the question as to which of the acts of Congress having particular reference to a civil government in Porto Rico were exclusively operative and effective there, there was considerable discussion at the arguments in respect to the character of the relation which the island

of Porto Rico sustains to the United States—whether it is that of a territory or that of a possession.

In Downes v. Bidwell, 182 U. S. 244, 21 Sup. Ct. 770, 45 L. Ed. 1088, which was a customs case, and in Kopel v. Bingham, 211 U. S. 468, 29 Sup. Ct. 190, 53 L. Ed. 286, which was a case for the extradition of a fugitive criminal, the relationship of Porto Rico apparently is not recognized as that of a territory fully incorporated into the United States. In Dorr v. United States, 195 U. S. 138, 24 Sup. Ct. 808, 49 L. Ed. 128, 1 Ann. Cas. 697, it was decided that the Philippine Islands were not incorporated into the United States, and it was said that until territory ceded by treaty has been incorporated into the United States, it is to be governed under Congress, without the restrictions which are imposed upon it when passing laws for the United States as a political body of states in union.

To sustain its contention that jurisdiction of the Interstate Commerce Commission was exclusive in the island of Porto Rico under the general provision of section 14 of the Foraker Act of April 12, 1900, which declares that the statutory laws of the United States, not locally inapplicable, have the same force and effect in Porto Rico as in the United States, the appellee chiefly relies upon American Railroad Co. v. Birch, 224 U. S. 547, 32 Sup. Ct. 603, 56 L. Ed. 879, and American Railroad Co. v. Didricksen, 227 U. S. 145, 33 Sup. Ct. 224, 57 L. Ed. 456.

The first of these was a case under the Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1916, §§ 8657–8665]), and the decision was upon the ground that the act expressly applies to Porto Rico, and this, as we understand, was upon the theory that the act by its terms not only included all common carriers in the states, in the territories, the District of Columbia, the Panama Canal Zone, but "other possessions of the United States." Thus the decision was based upon the scope of the statute rather than upon any strict interpretation of the question whether Porto Rico is a territory of the United States, or a possession.

And in the second of these cases, that of Didricksen, involving the question whether the Safety Appliance Act of March 2, 1903 (Act March 2, 1903, c. 976, 32 Stat. 943 [Comp. St. 1916, §§ 8613–8615]), was in force in Porto Rico, though it did not expressly extend to possessions, it was held that it was; and upon the ground that, while it was not in all respects a territory, that its organization was in most essentials that of political entities known as territories, and upon the theory, as we suppose, that the Safety Appliance Act related to the same subject-matter as that covered by the Employers' Liability Act, which expressly extended to Porto Rico, and was in aid of the protection to life and limb sought to be afforded through legislation upon the subject of the liability of railway common carrier employers. Nor do we consider the Alaska Case, 224 U. S. 474, 32 Sup. Ct. 556, 56 L. Ed. 849, in point, because that involved a continental situation, and a territory acquired by purchase, and a continuous carriage from the state of Washington to a point within Alaska—a territory which, by an act providing for its government, was designated as one which was to

constitute a civil and judicial district, the government of which should be organized and administered as was provided by the act. Moreover, the opinion in that case was written by the same justice who handed down the opinion in the Employers' Liability Case, 224 U. S. 547, 32 Sup. Ct. 603, 56 L. Ed. 879, a month later, in which the Alaska Case was not referred to as having any bearing.

We do not consider, however, that the solution of the question whether Porto Rico is in all respects a "territory" of the United States, in the strict sense, or whether it is "a possession of the United States," in the strict sense in which that term is used, would be altogether controlling upon the question of statutory construction involved in this case. It is not so much a question whether Porto Rico is, or is not, a "territory" of the United States, to be regarded critically, as an apt question, to be decided with legal exactness under refining rules, as it is the broader and more substantial question, whether, under the actual situation of remoteness, and the character of the relationship, Congress intended to carry the Interstate Commerce Commission powers to the island, to be exercised independently and exclusively of the local assembly.

Porto Rico is at least a "possession," and through its organized government, and under the Organic Act of April 12, 1900, has many of the essentials of those political entities known as territories, but, notwithstanding that, the substantial fact remains that it is an insular piece of ground, with a considerable population, many miles at sea and widely separated from the states and territories of the government which is charged with the responsibility of seeing that there is a civil government in the island. Therefore, without much regard to a refinement of the question as to which it is, it is the fact that it is an insular possession, or an insular territory, whichever it is, far removed from physical relations with other territories, and possessions, and with no physical relation to any of the states—with no interstate, interterritorial, or interpossession railroads, and the fact that the legislation of Congress and that of the local insular assembly had reference to such a situation, one in which the railroads were not operated beyond the boundaries of the island, which bears upon the question whether the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379), through no expression of its own, but under the general provision of section 14 of the Act of April 12, 1900, that the statutory laws of the United States, not locally inapplicable, shall have the same force and effect in Porto Rico as in the United States, should be accepted as comprehensively applying to such local conditions as are in question here, and to the exclusion of the comprehensive local legislative power delegated by Congress to be exercised under its eye and subject to expressly reserved power to approve or annul.

The District Court seems to have accepted the decisions in the Didricksen Case, 227 U. S. 145, 33 Sup. Ct. 224, 57 L. Ed. 456, and the Birch Case, 224 U. S. 547, 32 Sup. Ct. 603, 56 L. Ed. 879, as a ground for reasoning, and as quite controlling, that the general provision of section 14 of the Act of April 12, 1900, carried bodily to Porto Rico

the Interstate Commerce Act and the exclusive jurisdiction of the Interstate Commerce Commission.

Section 14 expressly qualifies itself by excepting laws locally inapplicable and as "hereinbefore" or "hereinafter" otherwise provided, and in view of the scope of the whole act and of the manifest intention to give the local government a broad power in respect to legislation upon local subjects, we cannot accept the view that Congress intended exclusive Interstate Commerce Commission jurisdiction over local railroad rates in Porto Rico, or that the Supreme Court decisions referred to support that idea.

There is a wide difference between the question of congressional intention involved in the exercise of the national function to protect life and limb, like that in the Employers' Liability and the Safety Appliance Acts—like that in the Bill of Rights of the Jones Act in respect to the protection of life and liberty against undue process of law, or that of the Kopel Case, 211 U. S. 468, 29 Sup. Ct. 190, 53 L. Ed. 286, which was for the extradition of a fugitive criminal—and that of the intention involved in the question whether the Organic Porto Rican law, under its general terms, intended exclusive Interstate Commerce Commission control over the local tariffs of the intra-island railroads of Porto Rico.

This general view, however, in respect to difference of subject-matter, is quite independent of, and aside from, the broad distinction between the apt words of the Employers' Liability Act, which expressly carry it to all possessions of the United States, and those of the general provision of section 14 of the Organic Law, which, it is contended, under an intention to be inferred, gave the Interstate Commerce Commission exclusive control over the subject of the railway rates of the insular possession in question.

Under the circumstances, and considering the Organic Act as a whole, we think the intended and comprehensive congressional delegation of legislative power in respect to local conditions would include subject-matter like that of local railway rates, and would control as against the contention that the Interstate Commerce Commission was clothed with exclusive jurisdiction through the force of the general terms of the same act, which are without any suggestion of a particular intent to carry such jurisdiction to the railroad affairs of the insular situation.

Indeed, the original idea of federal control and federal regulation was based upon physical interstate and interterritorial relations and upon connecting lines, conditions under which local interruptions impair the efficiency of the paramount federal right to regulate commerce between the states and territories. There is no such federal right or federal responsibility as between the people of the island of Porto Rico and their local railroads, and upon this general view, in respect to the question of the intention of Congress under the Organic Act, and after misunderstandings and discussion had arisen as to its scope, and as to the jurisdiction of the Interstate Commerce Commission, it is quite significant and something that must be considered that, through subsequent legislation, Congress declared, through the Act of March 2, 1917, c. 145 (39 Stat. pt. 1, p. 964) § 38, that the Interstate Commerce Act shall not apply to Porto Rico.

The leading theory of all the cases, on which the appellee relies, in support of the idea of the exclusive jurisdiction of the Interstate Commerce Commission, is that the power of regulation and control of interstate commerce and interstate railroads is a federal power, and it, having been asserted that it becomes parmount to, and exclusive of, interference under state and territorial governments. But it must be observed that these cases (like Southern Ry. Co. v. Reid, 222 U. S. 424, 436, 437, 32 Sup. Ct. 140, 56 L. Ed. 257; Southern Ry. Co. v. Reid & Beam, 222 U. S. 444, 447, 32 Sup. Ct. 145, 56 L. Ed. 263; Southern Ry. Co. v. Burlington Lumber Co., 225 U. S. 99, 32 Sup. Ct. 657, 56 L. Ed. 1001; Southern Ry. Co. v. Railroad Com'r of Indiana, 236 U. S. 439, 446, 447, 35 Sup. Ct. 304, 59 L. Ed. 661; Erie Ry. Co. v. People of the State of New York, 233 U. S. 671, 34 Sup. Ct. 756, 58 L. Ed. 1149, 52 L. R. A. (N. S.) 266, Ann. Cas. 1915D, 138) proceed upon the idea that federal control is exclusive, because Congress has asserted the right, and because federal control has occupied the field. They thus have no particular weight, first, because states (except as explained in Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18) might regulate tariffs before the right of federal control was asserted, and second, and more particularly, because, as we interpret the Organic Law, federal railway rate control in the new possession of the Island of Porto Rico, where of course there were no questions as to state control, was intended through the instrumentality of the Porto Rican Assembly, under the supervision of Congress exercised through its plenary right, in respect to federal territories and possessions, which was expressly reserved.

The subject of the local freight rates of a remote insular possession, or territory, railroad is not one suggestive of inherent necessity of regulation and control by a continental commission like that of the Interstate Commerce Commission, and while not doubting the paramount right of control by the United States, which we think was asserted under the Organic Act of April 12, 1900, through its delegation of legislative power and of its reserved right of supervision, we see nothing in any of the laws indicating an intention of Congress to make it a subject of exclusive Interstate Commerce Commission regulation.

It is quite possible that conditions might be created in the island of Porto Rico through corporate and business relations which would make its intra-insular railroad business an interterritorial, or an interpossession business, as by connecting with other territories or possessions, and one justifying federal legislation extending right of regulation to the Interstate Commerce Commission, but that no such exigency exists under present conditions is something to be considered upon the question whether Congress intended, either through the general provisions of the Foraker Act or through the provision of the Hepburn Act to carry the functions of the Interstate Commerce Commission to the intraterritorial transportations of the island.

Neither a statutory enactment like that creating Interstate Commerce Commission jurisdiction in the territories of the United States, nor one like the statute in amendment carrying jurisdiction from one point in

a territory to another point in the same territory, should be accepted as including a remote insular possession like that of Porto Rico, though its relations to the United States are somewhat those of a territory, unless there are apt words or cogent circumstances to show such a legislative purpose. The character and circumstances of Interstate Commerce Commission jurisdiction and the situation of the island of Porto Rico do not support the idea of any such congressional purpose.

It is contended by the petitioners that the intricacies of the commercial relations between the states and territories of continental United States do not apply to Porto Rico in its isolated position, and that seeking remedy in respect to its railway rates through the remote interstate commerce tribunal would be inconvenient, expensive and oppressive, and we regard that as something to be considered upon the question of congressional intent.

There is no reason why Congress as the supreme and paramount legislative body may not legislate broadly with reference to the liability of employer railway common carriers in the possessions of the United States, if it sees fit to do so. That Congress had delegated quite a measure of initiatory legislative power to the local Assembly of Porto Rico, to be exercised subject to its approval, furnishes no reason for saying that Congress may not consistently establish a uniform rule in respect to employer liability to be administered alike in interstate conditions and throughout all the territories and possessions of the United States, and it is difficult to see that the exercise of such right to establish a uniform rule in respect to life and limb, under a law which expressly includes "possessions," furnishes any reason for saying that it carries the idea that Interstate Commerce Commission jurisdiction shall go to Porto Rico under general laws which in all probability did not embody that idea. Employer liability, under a federal statute like that we are discussing, designed to protect life and limb, would be ascertained and established under a uniform rule founded upon a principle, while railroad rates, from their nature, could not be uniform or governed by a single principle. They necessarily depend upon local conditions, and there is thus no analogy between the two subjects in the legislative sense.

It is true that the Act of June 29, 1906, c. 3591 (34 Stat. pt. 1, p. 584), which is now known as the Hepburn Act, and which was an amendment of the act of 1887 to regulate commerce, extends the territorial jurisdiction of the Interstate Commerce Commission and expressly makes it apply to transportations "from one place in a territory to another place in the same territory," but although these words are apt in respect to territories incorporated into the United States and intratransportation therein, we do not think they were apt with respect to a possession like that of Porto Rico whose status at most was only that of a quasi territorial relationship.

At the time of the Foraker Law and the Hepburn Law, and even as late as 1911 and 1912, when the Birch and Didricksen Cases were decided in the Supreme Court, whether Porto Rico was a territory of the United States, within the meaning of that term, was questionable— something in uncertainty and doubt—and, as has been seen, it is con-

tended that these acts apply to Porto Rico, because of the general term "territory," but, under the most favorable view of this contention, Porto Rico was only a territory of quasi territorial organization and relationship, and so the general term "territory" does not expressly include Porto Rico, as did the term "possession" in the Employers' Liability Act, and, under the circumstances, "territory," as used in these statutes should not be broadly construed for the purpose of including a possession, or a quasi territory, whose relationship was that which the island of Porto Rico sustained to the United States.

In the Birch Case, 224 U. S. 547, 32 Sup. Ct. 603, 56 L. Ed. 879, the Employers' Liability Act was held operative in Porto Rico, because the act applied to common carriers in the territories, the District of Columbia, the Panama Canal Zone, and expressly to the "possessions" of the United States, and a contention in respect to the Safety Appliance Act raised the question whether that act, which did not expressly include "other possessions of the United States" and only expressly applied to carriers by railroad in territories and the District of Columbia, extended to Porto Rico, and the Supreme Court, treating that contention as one presenting a serious controversy, did not decide whether the Safety Appliance Act was in force in Porto Rico. In the Didricksen Case, 227 U. S. 145, 33 Sup. Ct. 224, 57 L. Ed. 456, the relationship of the island to the United States was discussed, with the observation, in effect, that while it was not a territory incorporated into the United States, that it had most of the essentials of those entities known as territories; but we infer from the reasoning of the opinion that the real ground on which the case turned was that the rights involved under the Safety Appliance Act were incident to the subject-matter and the rights involved in the Employers' Liability Act, which did by its terms extend to Porto Rico as one of the possessions of the United States, rather than upon the distinct ground that it was a territory in the ordinary sense in which that term is used in legislation in general. At least we think we would not be warranted in accepting these decisions as meaning that the term "territories," when used in congressional legislation with reference to the general subject of commerce, would carry the exclusive jurisdiction of the Interstate Commerce tribunal to an island whose relationship is that of Porto Rico.

In the Act of June 29, 1906 (Hepburn), which we are discussing, Congress was dealing with states and territories of the United States, and with waterways in them, and between them and foreign countries, and its only departure from that idea was to the District of Columbia, which it designated by name, although it is a distinct United States entity, and is, in fact, territory within the United States. Thus when Congress departed from what in the ordinary acceptation would be understood as covered by the general legislative designation of states and territories, with the view of including an entity not understood to be a territory in the general acceptation of that term, like that of the District of Columbia, it expressly named it, though it is in fact, while not having the relationship of a territory of the United States, both a piece of territory and a possession belonging to the United States,

thereby indicating the purpose, when departing from the term "territory," as something having a well understood legislative meaning, with the idea of including a piece of territory, or a possession not usually known as a territory, to expressly designate it.

We think if Congress had intended by this act to carry the powers of the Interstate Commerce Commission to Porto Rico that it would have said so as it did of the District of Columbia. It is highly probable, and quite safe, we think, to assume that Congress did not view Porto Rico as a territory in the sense in which it was legislating, and was without the slightest thought that it was legislating with reference to the internal affairs of Port Rico and the local railway rates of that remote insular possession.

And in addition to these views, which we hold under general rules in respect to interpretation, there is the subsequent declaratory interpretation and expression of congressional intent in what is known as the Jones Act, to which we have referred, designed to provide a civil government for Porto Rico, which declares that the Interstate Commerce Act and its amendments shall not apply to Porto Rico. Act March 2, 1917 (39 Stat. pt. 1, p. 964) § 38.

Moreover, it is not understood that the Interstate Commerce Commission has asserted any authority in Porto Rico, other than to make orders in respect to safety appliance devices on Porto Rican railroads, and these were after the decisions in the Birch and Didricksen Cases, and before this statute declaring that its jurisdiction should not apply to Porto Rico.

[2] By section 31 of the Act of April 12, 1900 (Comp. St. 1916, § 3780), the Organic Law under which the local statute in question was passed by the Porto Rican Assembly, it was provided that all laws enacted by that body should be reported to the Congress of the United States, which reserved to itself the power and authority, if deemed advisable to annul, and the legislative assembly of Porto Rico enacted that the secretary of the island should promulgate all laws enacted by the legislative body. Comp. Stat. Porto Rico, p. 512, § 55 (section 2726).

Under these provisions and under such circumstances, it is to be presumed, we think, in the absence of proofs or suggestion to the contrary, that the local Porto Rican legislation was reported to Congress, or, at least, that Congress was cognizant of such legislation, and in the absence of affirmative action by that body, that there was congressional acquiescence. Clinton v. Englebrecht, 13 Wall. 434, 446, 20 L. Ed. 659; Camou v. U. S., 171 U. S. 277, 287, 18 Sup. Ct. 855, 43 L. Ed. 163; Tiaco v. Forbes, 228 U. S. 549, 557, 558, 33 Sup. Ct. 585, 57 L. Ed. 960; Baca v. Perez, 8 N. M. 187, 42 Pac. 162.

The conclusion is that the Porto Rican Public Service Act of March 12, 1908, was a legislative law warranted under the authority delegated by Congress; that it was a valid enactment and is controlling until disapproved by Congress under its paramount and expressly reserved right of supervision; that its effectiveness was not superseded or impaired by the original Interstate Commerce Law of 1887, or as amended by the Act of June 29, 1906, known as the Hepburn Act, and

that this is so both because they are inapplicable under the present condition of affairs in the island, and because Congress never intended that they should be operative there. And the conclusion in respect to the Act of March 2, 1917, known as the Jones Act, is that it neither superseded nor impaired the Porto Rican Act of March·12, 1908, because section 57 declared that the laws of Porto Rico then in force should continue until amended or repealed by the Legislature.

It is true that the Porto Rican Assembly subsequently passed a law December 6, 1917 (2 Laws of Porto Rico, 432), with respect to public service companies, creating a public service commission, and one which provided for its powers and for control over public service companies, but it is not suggested that there is anything expressly repealing section 7 of the Act of March 12; 1908. On the contrary, the idea of the act is that railway schedules shall not only be just and reasonable, but in conformity with the regulations and orders of the commission, and indeed it is expressly provided by section 23 of article 5 of the act that all rates and charges filed by the extinct executive council shall continue and be in full force until modified or repealed by the commission.

Quite likely this act of the Porto Rican Legislature of December 6, 1917, has no controlling force upon the questions involved in this proceeding, and it is referred to merely to show that there is nothing in the present Porto Rican situation which is inconsistent with the idea that railroads shall submit to local legislative regulations created under the authority of the United States, or with the idea that section 7 is still operative so far as concerns the decision of the questions in this case.

[3, 4] This is an equity proceeding prosecuted by the Attorney General of Porto Rico in behalf of the people and the executive council of the island, and one which was removed from the local district court of San Juan to the District Court of the United States for the District of Porto Rico, upon the ground of diverse citizenship. It was removed by the defendant railroad upon the allegation that the amount in controversy, which it would lose if the relief prayed for by the plaintiff was granted, exceeded the sum of $3,000; and the court to which it was removed, having adequate power under its own comprehensive equity jurisdiction, not by virtue of the local statute in respect to injunctions, may well establish the rights involved and afford relief according to the usual course of equity, as generally administered in the United States courts.

We have in this case questions relating to matters publici juris and the relief sought is an injunction (and perhaps other reliefs, like recovery of unauthorized rates) upon the ground that the railroad was operating under a rate schedule, and was demanding from members of the public, tariff transportation rates in open defiance of a regulatory law. This is plain ground for injunctive relief, and neither the penalty provision of the local law, nor any supposed remedy by way of forfeiture, excluded or limited the jurisdiction of the United States District Court (In re Debs, 158 U. S. 564, 584, 592, 593, 15 Sup. Ct. 900, 39 L. Ed. 1092) to enjoin against publishing and demanding rates

in disregard of the requirements of section 7 of the local law; and in the circumstances, it is not seen that any other remedy, either at law or in equity, would be reasonably adequate.

Holding the view that we do as to the operativeness of the Porto Rican Act of March 12, 1908, there seems to be no occasion for discussing the emergency provision of that law, and this results because the substantial relief sought, that of protection to the people of Porto Rico against unauthorized and unlawful rates, may be had through injunction under their original bill by virtue of the force of section 7 of the Porto Rican law, quite independent of its emergency provision in respect to temporary and tentative reliefs, and quite independent of the proceedings and findings under the amended bill.

The decree of the District Court dismissing the bill should be vacated, in order that there may be an injunction which should be continued until the defendant railroad has complied with the regulatory provisions of the Porto Rican law, and for further proceedings, if any are necessary, not inconsistent with this opinion.

The decree of the District Court is reversed, and the case is remanded to that court with directions to issue an injunction, and for further proceedings not inconsistent with this opinion; and the appellant recovers costs of this court.