## WRIGHT *v.* YNCHAUSTI AND COMPANY.

CERTIORARI TO THE SUPREME COURT OF THE PHILIPPINE
ISLANDS.

No. 316. Argued October 28, 1926.—Decided December 13, 1926. ·

1. A decision of the Insular Collector of Customs, of the Philippine
   Islands, ordering that moneys collected and paid under protest, as
   customs duties, be refunded upon the ground that the property
   assessed was not dutiable under the tariff, is final and conclusive,
   unless appealed to the Court of First Instance. P. 644.
2. The Insular Auditor has no power to reëxamine the merits of· such
   a decision by the Insular Collector, and his duty to countersign the
   Insular Collector's warrant for the refund, when in due form and
   drawn upon an applicable appropriation, is ministerial, and en-
   forceable by mandamus. P. 651.

47 P. I. Rep. 866, affirmed.

CERTIORARI (271 U. S. 652) ·to a judgment of the
Supreme Court of the Philippine Islands awarding an
original mandamus, at the suit of Ynchausti & Company,
to compel Wright, the Insular Auditor, to countersign a
warrant drawn by the Insular Collector of Customs in
favor of the firm, for a refund of money erroneously col-
lected as customs duties.

*Messrs. L. H. Hedrick* and *O. R. McGuire* for the
petitioner.

*Mr. William H. Lawrence,* with whom *Messrs. F. W.
Clements, Lawrence H. Cake,* and *Alexander Britton* were
on the brief, for the respondent.

MR. CHIEF JUSTICE TAFT delivered the opinion of the
Court.

This case was begun by a petition filed by Ynchausti
and Company, January 19, 1925, in the Supreme Court
of the Philippine Islands, under § 2947 of the Compiled
Acts of the Philippine Commission, 1907, for an original

writ of mandamus directed to Ben F. Wright, Insular Auditor, to require him to countersign a warrant for 159,960 pesos drawn by the Insular Collector of Customs in favor of Ynchausti and Company. The Insular Auditor filed an answer, to which the petitioner demurred, on the ground that the facts stated therein were not sufficient to constitute a defense. The Supreme Court of the Philippine Islands sustained the demurrer and ordered that the writ issue as prayed. This Court granted a certiorari April 26, 1926. 271 U. S. 652.

Ynchausti and Company were the agents and operators of the steamship Venus, a vessel engaged in the coastwise trade in the Philippine Islands. They sent her to Hong Kong, a Crown colony of Great Britain, there to receive certain heavy repairs and construction work. When the vessel returned to the Philippines, the Insular Collector of Customs, who is Collector at Manila and who has subordinate collectors at other ports, assessed a customs duty of 159,960 pesos on account of the repairs. Ynchausti and Company paid the duty, but filed a protest with the Collector, on the ground that the repairs were free from duty under the law. The Collector deposited the money in the Insular Treasury. Upon a hearing of the protest and an examination of evidence, the Collector reversed his ruling, rendered a decision sustaining the protest and ordered a refund of the money paid, under a permanent appropriation for such purposes. A copy of the Collector's decision was sent to the Secretary of Finance and the Insular Auditor. The Secretary of Finance did not certify a desire to appeal from the Insular Collector's decision to the Court of First Instance within fifteen days thereafter, as authorized by law, although the Insular Auditor urged it. After the time for an appeal had expired, a warrant was drawn by the Insular Collector in favor of Ynchausti and Company for the amount of the duty paid. Upon presentation of the warrant to the Insular Auditor for his

countersignature, required by the Administrative Code of the Islands to be attached to every warrant, he withheld it.

By §§ 614, 616, 621 of the Insular Administrative Code of 1917, revenue funds are not to be withdrawn from the Insular Treasury except upon warrant. Warrants are to be drawn upon the Insular Treasury by the Chief of the Bureau or office having control of the appropriation or fund against which such warrants are chargeable, and are to be made payable to the creditor to whom the money is due. No Insular warrant is to be paid by the Treasurer until countersigned by the Auditor. By § 3920 of the Compiled Laws of the Philippines of 1907, a permanent appropriation is provided for refund of duties paid into the Treasury in excess of the final liquidation and the amount legally due.

The history of the legislation, in respect of classification for duties on repairs of Philippine vessels made in a foreign country, is as follows:

The Philippine Tariff Act of Congress of August 5, 1909, 36 Stat. 130, c. 8, § 8, provided:

" That the rates of duties to be collected on articles, goods, wares, or merchandise imported into the Philippine Islands, or going into said islands from the United States, or any of its possessions except as otherwise provided in this Act, shall be as follows: . . .

" Par. 200. Boats, launches, lighters, and other water craft, set up or knocked down, imported into the Philippine Islands, and cost of repairs made in foreign countries to vessels, or to parts thereof, documented for the Philippine coastwise trade or plying exclusively in Philippine waters and for which repairs adequate facilities are afforded in the Philippine Islands, fifty per centum ad valorem.

" Provided, That upon proof satisfactory to the collector of customs that adequate facilities are not afforded

in the Philippine Islands for such repairs, the same shall be subject to the provisions of paragraph three hundred and forty-eight of this Act."

Paragraph 348 is part of § 11 of the same act, and declares that certain imports shall be free of duty upon the importation thereof into the Philippine Islands. One is described as follows:

" Repairs to vessels documented in the Philippine Islands or regularly plying in Philippine waters, made in foreign countries, upon proof satisfactory to the collector of customs that adequate facilities for such repairs are not afforded in the Philippine Islands."

This Tariff Act was amended by the Philippine Legislature under the authority of the Act of Congress of August 29, 1916, 39 Stat. 545, c. 416, usually called the Jones Act, by § 10 of which it is provided:

" That while this Act provides that the Philippine government shall have the authority to enact a tariff law the trade relations between the islands and the United States shall continue to be governed exclusively by laws of the Congress of the United States: *Provided*, That tariff acts or acts amendatory to the tariff of the Philippine Islands shall not become law until they shall receive the approval of the President of the United States."

Acting under this authority, the Philippine Legislature passed an amendment to the Tariff Act, entitled No. 2872, which was approved by the President of the United States on November 24, 1919. That Act amended § 200, already quoted, by continuing the duty on repairs at 50 per cent. until December 31, 1924, and then reducing the rate to 25 per cent. thereafter, and changed the proviso as follows:

*"Provided,* That upon proof satisfactory to the collector of customs that adequate facilities are not afforded in the Philippine Islands for such repairs, so that the work can not be done there reasonably economically and

within a reasonable time, in the judgment of said collector, such repairs shall be subject to the provisions of paragraph three hundred and forty-eight of this Act." .

The question here presented is whether the Philippine Auditor may consider and reverse the ruling of the Insular Collector in respect of the refund of the duties paid on these repairs, or whether the ruling of the Insular Collector under the circumstances is final and the necessary countersigning of the warrant drawn by the Insular Collector is merely a ministerial duty subjecting the Auditor to mandamus.

The Act of Congress of August 29, 1916, to provide a more autonomous government for the Philippines, known as the Jones Act (39 Stat. 545, c. 416, § 24), describes the present powers and duties of the Insular Auditor in part as follows:

" That there shall be appointed by the President an auditor, who shall examine, audit, and settle all accounts pertaining to the revenues and receipts from whatever source of the Philippine government and of the provincial and municipal governments of the Philippines, including trust funds and funds derived from bond issues; and audit, in accordance with law and administrative regulations, all expenditures of funds or property pertaining to or held in trust by the government or the Provinces or municipalities thereof. He shall perform a like duty with respect to all government branches.

" He shall keep the general accounts of the government and preserve the vouchers pertaining thereto.

" It shall be the duty of the auditor to bring to the attention of the proper administrative officer expenditures of funds or property which, in his opinion, are irregular, unnecessary, excessive or extravagant. . . .

" The administrative jurisdiction of the auditor over accounts, whether of funds or property, and all vouchers and records pertaining thereto, shall be exclusive. With

the approval of the Governor General, he shall from time to time make and promulgate general or special rules and regulations not inconsistent with law covering the method of accounting for public funds and property, and funds and property held in trust by the government or any of its branches:   . . .

" The decisions of the auditor shall be final and conclusive upon the executive branches of the government, except that appeal therefrom may be taken by the party aggrieved or the head of the department concerned within one year, in the manner hereinafter prescribed. The auditor shall, except as hereinafter provided, have like authority as that conferred by law upon the several auditors of the United States and the Comptroller of the United States Treasury and is authorized to communicate directly with any person having claims before him for settlement, or with any department, officer, or person having official relations with his office.  . . ."

In the administration of his duty, he is authorized to summon witnesses, administer oaths and to take evidence and enforce the attendance of witnesses.

Section 25 provides:

" That any person aggrieved by the action or decision of the auditor in the settlement of his account or claim may, within one year, take an appeal in writing to the Governor General, which appeal shall specifically set forth the particular action of the auditor to which exception is taken, with the reason and authorities relied upon for reversing such decision.

" If the Governor General shall confirm the action of the auditor, he shall so indorse the appeal and transmit it to the auditor and the action shall thereupon be final and conclusive. Should the Governor General fail to sustain the action of the auditor, he shall forthwith transmit his grounds of disapproval to the Secretary of War, together with the appeal and the papers necessary to a

proper understanding of the matter. The decision of the Secretary of War in such case shall be final and conclusive."

The argument is that, as the subject matter here is a claim against the Insular Treasury, it is necessarily exclusively within the broad powers of the Auditor to pass on it, and that his duty to countersign the warrant for it includes this discretion, which can only be reviewed by the Governor General and the Secretary of War. There is no doubt that, from the beginning of the civil government in the Philippines, established by the President as Commander-in-Chief, in 1901, it was his intention to give to the Secretary of War the means of supervising the disbursements of the funds in the Philippine Treasury and the allowance of claims upon them through the Insular Auditor, who was to be appointed by the Secretary of War. Presidential Order, February 23, 1901, Act No. 90, Public Laws Enacted by the Philippine Commission, vol. 1, p. 160. There was substituted by the Philippine Commission for Act. No. 90, the Accounting Act, No. 1402, in 1905, *op. cit.*, vol. 5, p. 58, and the new Accounting Act, No. 1792, in 1907, *op. cit.*, vol. 6, p. 475. Then followed the Administrative Act of 1916, by the Philippine Legislature, which created a Board of Audits, with the Auditor at its head; and this was repeated in the Administrative Code of 1917, c. 26, enacted after the passage of the Jones Act. The scope of duties of the Auditor as conferred in Act No. 90 is substantially the same as in the acts which have followed it. It was said in all these acts, including the Jones Act, that the Insular Auditor should have the same authority as the several auditors of the United States and the Comptroller of the Treasury.

Parallel with this legislation, however, was the Customs Administrative Act of 1902, No. 355, Public Laws Enacted by the Philippine Commission, vol. 1, p. 788, which organized the Bureau of Customs on February 6, 1902,

very shortly before the passage by Congress of an act temporarily to provide revenue for the Philippine Islands, March 8, 1902, 32 Stat. 54, c. 140, confirming the Tariff Act passed by the Commission in September, 1901, No. 230, Public Laws Enacted by the Philippine Commission, vol. 1, p. 581. By that Act, and by all subsequent amending acts on the subject, collectors of customs were given the duty of liquidating the duties, of determining abatements for manifest clerical error, and for loss or damage of goods, and of promptly granting refunds as allowances or abatements, and those claims thus allowed by the collectors were to be certified to the Auditor of the Islands, with their recommendations and with all necessary papers and documents. This was provided evidently to permit prompt correction of clerical and other obvious errors by the collector. The Auditor was directed to audit the same and draw the warrant for the refund so forwarded in settlement therefor if found correct. The foregoing is embodied in existing law in the Administrative Act of 1917, and it may be that in such a case, by reason of the language used, the Insular Auditor is given discretion to withhold his approval of a refund thus granted by the Collector. We do not find it necessary to decide that question and only mention it in order to make clear the question before us and what we are deciding.

What we are here dealing with is, not clerical or other obvious errors in collections, but controversies over the classification of articles for duty under the Tariff Act, and the determination of the duties to be assessed upon such articles by the Collector, accompanied and contested by a filed protest of the importer. In such a case, a different system has been provided from the beginning, 1902. By §§ 286, 287, 288 and 289 of the Customs Administrative Act of 1902, provision was made for the clas-

sification of the imports and the fixing of duties by the Collector, and their collection, a protest by a tax payer who objected, an appeal on that protest to the Insular Collector, an appeal from his decision by the defeated tax payer to a court created by the Act, called a Court of Customs Appeals, which conclusively decided the question. This law also provided that if the decision of the Insular Collector was adverse to the government, the Secretary of Finance and Justice, the head of the Department, might within a certain time initiate an appeal to the Court of Customs Appeals. Thereafter the personnel of the Court of Customs Appeals was changed in Act No. 864, September 2, 1903, Public Laws Enacted by the Philippine Commission, vol. 3, p. 3, and an appeal given upon the disagreement between the Judges of the Court of Customs Appeals to the Supreme Court.

By Act No. 1405, adopted by the Commission October 13, 1905, Public Laws Vol. 5, p. 75, the Court of Customs Appeals was abolished and its duties were transferred to the Court of First Instance, with an appeal to the Supreme Court, and these changes were all embodied in the compilation of the statutes made in 1907 and have been continued since, in the Administrative Acts of 1916 and 1917. No change in the administration of the Bureau of Customs or the Bureau of Audits was made by the Philippine Tariff Act of Congress, of August 5, 1909, 36 Stat. 130, c. 8, which supplanted the Tariff Act of the Philippine Commission of 1902.

The present procedure fixed by Philippine law for raising the question of the legality of classification for duty on importations and of the collection of such duties is to be found in the Administrative Code of the Islands of 1917, already cited, made necessary by the passage of the Jones Act.

The relevant sections of the Code follow:

" Section 1383. The party aggrieved by the decision of the Insular Collector in any matter brought before him

upon protest or by his action or decision in any case of seizure may procure the cause to be removed for review into the Court of First Instance sitting in the city of Manila, in the manner and within the period hereinafter prescribed.

"Unless the proper party in interest shall procure the cause to be thus removed into court for review, the action or decision of the Insular Collector shall be final and conclusive against him.

"Section 1384. The removal of a cause into court may be had at the instance of the protesting party, or, in case of seizure, at the instance of the owner or agent of the seized property. If the decision of the Insular Collector is adverse to the Government the cause may also be removed in the manner hereinafter specified, by order of the Department Head.

"Section 1386. Upon making any decision which may be removed upon the order of the Department Head, the Insular Collector shall immediately transmit a copy of such decision to him and also to the Insular Auditor; and if within fifteen days thereafter the Department Head shall certify that in his opinion the decision ought to be revised by the Court of First Instance in the city of Manila, it shall be the duty of the Insular Collector, upon notification thereof, to transmit the original record to said court in the same manner as upon removal by a party other than the Government."

This history shows that, since the beginning of civil government in the Philippines, the policy of the Island Government has been to take out of the jurisdiction of the Auditor contested claims for refund of duties based on protest, and involving a re-examination of the action of the local Collectors of Customs by the Insular Collector in assessing such duties. The decisions of the Insular Collector, with respect to refunds of this class, were administratively final, but appeals from his conclusions,

if duly taken, became the subject of judicial examination, at first by the Court of Customs Appeals, and afterwards by the Court of First Instance of the proper jurisdiction, and by the Supreme Court.

It is thus quite clear that the provision of the Jones Act and of acts which preceded it, for review of the decisions of administrative officers by the Insular Auditor from which appeals could be taken to the Governor General of the Islands, and thence to the Secretary of War, was not intended to include decisions upon protested classification of duties under the Tariff Act.

The unchanged policy as to such decisions is, that appeal from the Insular Collector's action should be left to the taxpayer, on the one hand, and to the head of the Finance Department, on the other, and, if taken, should be considered by the courts; and that, failing such appeal, the action of the Insular Collector should be final. It would be incongruous to provide for appeal to the courts at the instance of either the importer or the head of the department, and, in the absence of such appeal by either, to have a review by the Auditor. It would delay decision of the legality of the classification for a year. It would create two tribunals of appeals in respect of classification which might cause embarrassing and confusing conflict.

It has not been directly argued, but there has been an intimation in the argument for the petitioner, that greater weight is to be attached to the Congressional acts, including the Jones Act, in defining the duties of the Auditor, than to the provisions of the Customs Administrative Act of 1902, and of the Administrative Acts of 1916 and 1917, fixing the duties of the Insular Collector in classification of duties and appeals to the courts, which were acts only of the Philippine Commission or the Philippine Legislature without specific Congressional approval. If there were a conflict between the two, of course, the Congressional legislation must control. But conflict is not to be pre-

sumed because, first, under the Letter of the President in establishing the Philippine Commission, of date April 7, 1900, Public Acts Enacted by the Philippine Commission, vol. 1, p. lxiii; second, under the Act of Congress of July 1, 1902, 32 Stat. 691, c. 1369, confirming the prior legislative action of the Philippine Commission and vesting future legislative power in the Commission and in a subsequent legislature therein provided for, and third, under the Jones Act, 39 Stat. 545, c. 416, changing somewhat the form of the Philippine government, all general legislative power was vested in the Island legislature, with some exceptions, of which none included the administrative provisions for collecting the customs revenue. Of course all such legislation was subject to annulment by Congress, but although the legislative provisions for action by the Insular Collector of Customs and the courts in respect of classification of imports and collection of duties were established in 1902, and continue until to-day, they have never been disturbed, and have evidently never been thought by Congress to be in conflict with the powers of the Auditor.

In view of this legislative history, it is not difficult to reach a conclusion and to define what the function of the Auditor of the Islands is in such a case as this. To take money out of the Treasury on appropriation, a warrant has to be drawn by the head of the bureau having the payment of the claim in charge, and the warrant must be countersigned by the Insular Auditor before it is paid; but where the Insular Auditor is not vested with administrative discretion to pass upon the merits of the claim for which the warrant is drawn, his only function is to determine whether the warrant is drawn by the proper officer upon the decision of the proper tribunal, and is applicable to an existing appropriation; and, having been satisfied as to these preliminaries, his duty is merely ministerial. In this case, having ascertained that

the Insular Collector has rendered an opinion that was final by reason of a failure of either party to appeal to the court therefrom, it is his duty to countersign the warrant and such a duty may be controlled by mandamus. *Kendall* v. *United States,* 12 Pet. 524; *Work* v. *United States ex rel. McAlester-Edwards Coal Co.,* 262 U. S. 200; *Work* v. *United States ex rel. Mosier,* 261 U. S. 352.

We may add that such a conclusion is quite in keeping with the functions of the Auditors of the Treasury and the Comptroller of the Treasury of the United States, a comparison which is constantly used in the Philippine statutes. Neither the Auditors nor the Comptroller of the Treasury of the United States are vested with authority to decide questions of classification of duties under tariff acts. Those are considered and disposed of, first by the Collectors of Customs, then by appeal after written notice to a Board of General Appraisers, and then by a review by the Court of Customs Appeals. Act of June 10, 1890, 26 Stat. 131, 136, c. 407, § 12; Act of May 27, 1908, 35 Stat. 403, 406, c. 205, § 3; Act of August 5, 1909, 36 Stat. 11, 98, c. 6, § 28; Act of September 21, 1922, 42 Stat. 858, 970, c. 356, Title IV, § 515. Under certain limitations a further review may be had in this Court. Act of August 22, 1914, 38 Stat. 703, c. 267.

The judgment of the Philippine Supreme Court is

*Affirmed.*