## BERGER et al. v. CHASE NAT. BANK OF CITY OF NEW YORK.
### No. 259.

Circuit Court of Appeals, Second Circuit.
July 24, 1939.

Martin Conboy, of New York City (Conboy, Hewitt, O'Brien & Boardman, John Vance Hewitt, and Edward F. Butler, all of New York City, and Swagar Sherley, Brice Clagett, and George B. Springston, all of Washington, D. C., of counsel), for plaintiffs-appellants.

Henry Root Stern, of New York City (Mudge, Stern, Williams & Tucker, George L. Trumbull, and Randolph H. Guthrie, all of New York City, and Donald Kehl, of Cambridge, Mass., of counsel), for defendant-appellee and cross-appellant.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This appeal, by five receivers or liquidators of closed national banks from decrees

dismissing their complaints in five suits consolidated for trial, and tried together below, attacks the validity of pledges by national banks given to secure deposits of the Philippine Government.

The character of the claims involved and the issues raised in all the suits are substantially the same. Each of the closed banks, prior to its insolvency, had been designated a depositary of funds of the Philippine Government by an order of the Secretary of War of the United States— purporting to act pursuant to Philippine legislation hereinafter discussed—and, as required upon such designation, had deposited certain bonds as security for the accounts thus authorized with the Bureau of Insular Affairs of the War Department (in charge of matters pertaining to civil government in the island possessions of the United States, 48 U.S.C.A. § 1). After the banks were placed in the hands of the receivers and liquidators, the Secretary of War, acting on behalf of the Philippine Government, with the consent of the Comptroller of the Currency, contracted for the sale of the bonds. In three instances the bonds were delivered to the defendant, the Chase National Bank, for delivery to purchasers, and the defendant received from the purchasers checks payable to its order, which were paid through the clearing house. In two instances, the bonds had been held for safe keeping by a federal reserve bank which, in accordance with instructions from the Bureau of Insular Affairs, delivered them to purchasers and credited the amount of the purchases to deposit accounts of the Chase Bank. In each instance the Chase Bank placed credits on its books to the Philippine Government in the amounts of the proceeds of the sales. Each of these suits is brought to impress a trust upon, and to recover, these proceeds. In two of the suits the receivers also seek to reclaim payments made by them to the defendant to supply deficiencies between these proceeds and the deposit balances to which they were applied.[1]

In the District Court the defendant moved in four of the suits to dismiss the complaints, on the ground that the Commonwealth of the Philippine Islands[2] was an indispensable party. The motions were denied, the court, through Judge Knox, ruling that, since the pledges were ultra vires and void, they vested no interest in the intended pledgee, and that, accordingly, the intended pledgee, the Philippine Commonwealth, was not an indispensable party. Baldwin v. Chase Nat. Bank, D. C., 16 F.Supp. 918, 919. After trial, the court, through Judge Woolsey, dismissed all the bills of complaint on the merits, ruling, among other things, that there was no trust res, since the court had no jurisdiction over the owner of the assets (the Philippine Commonwealth), and that the Commonwealth was immune from suit as a sovereign. Bradford v. Chase Nat. Bank, D.C., 24 F.Supp. 28.

After the appeals herein were taken, the defendant took cross-appeals in the four suits in which it had moved to dismiss

---

[1] These payments, which had been made before any question of the validity of the pledge agreements had been raised, were $6,154.41 and $67,132.54 respectively. In each of the other three cases, the proceeds from the bonds had exceeded the balance due the Philippine Government and the defendant had remitted the excess to the receiver or liquidator entitled to it. Though the total amount of the deposits in question in all the five banks was nearly five million dollars, the amount of possible recovery herein is much less, being reduced, first, by stipulation, by liquidating dividends received by the Philippine Government in common with other creditors of the banks, and, second, by withdrawals properly made from the Philippine accounts in the defendant bank before the latter had notice of the plaintiffs' claims. There is sharp dispute as to the method of ascertaining the balance due in these accounts, which were fourteen in number. Plaintiffs claim that there is a presumption against illegal withdrawals, and hence all moneys in these accounts to the amount of the "lowest intermediate balance" after they were made (a total of $162,823) are subject to the demands herein under In re Hallett's Estate, 13 Ch.D. 696, and further that money can be traced from one account to another while still in the defendant's possession (thus increasing the total to $222,066.41). Defendant, while contesting all liability, asserts that in any event withdrawals are to be credited to the first sums deposited, under Clayton's Case, 1 Mer. 572 (the "first in, first out" rule), which would leave only $33,733.90 due in a single case, that of The Bank of Pittsburgh. The court below agreed with the defendant.

[2] Successor to the earlier Philippine Government upon the grant of Philippine independence in 1935, 48 U.S.C.A. §§ 1231–1245.

for lack of an indispensable party in order to preserve its claims on these motions. A sixth suit, involving a state bank, was also tried as a part of the consolidated cause below, but the court ruled that under the state statutes the bank had power to pledge its assets, and no appeal was taken from the decree of dismissal in this case.

Although the Commonwealth of the Philippine Islands is not a party to these suits, the Secretary of War, appearing specially by his counsel as amicus curiae, has made a "suggestion" in its behalf of its ownership of the funds, a "representation and claim" which the Secretary finds "are made in good faith and are substantiated by records and documents in the possession of the Bureau of Insular Affairs of the War Department of the United States," and further of its immunity from suit as a sovereign state. Page 36 of 24 F.Supp. The Commonwealth has not, however, assumed responsibility for the defense of these suits or for the payment of any judgments which may be rendered against the defendant herein, although it has assumed responsibility for the payment of defendant's counsel fees. The natural interest, not merely of the Commonwealth, but of the Bureau of Insular Affairs of the War Department, in a favorable outcome of these suits is shown by a letter from the Bureau's Chief to the defendant after the suits were begun wherein, while denying responsibility of the Philippine Government further than as here stated, he does refer to the "action indicated" of "close coöperation in the vigorous defense of these suits by the Philippine Government, this Bureau, and the Chase Bank."

The plaintiffs' claim of invalidity of the pledges is based upon the authority of Texas & Pacific R. Co. v. Pottorff, 291 U.S. 245, 54 S.Ct. 416, 78 L.Ed. 777, and Marion v. Sneeden, 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787, which recently settled a point previously in dispute, that national banks have no power to pledge their assets to secure deposits, public or private, in the absence of direct legislative authorization.[3] Defendant claims that such authorization exists as to deposits of the Philippine Is-

lands through acts of the Philippine legislative body, assented to by Congress. It further relies on a series of defenses—that the pledges now constitute executed transactions not to be set aside, that the claims were fully settled by proper authorities, that there is no trust res, that (except for $33,733.90 in one suit) defendant paid out these funds in good faith before action was brought, that the claims are barred by statutes of limitations and because of plaintiffs' laches, that the complaints were properly dismissed on the ground of sovereign immunity, and that the Commonwealth of the Philippine Islands was an indispensable party. Since we support the defendant's first point—legislative authorization of the pledges—we need not pass upon the other points raised by the defendant further than to suggest that they seem to depend largely, perhaps wholly, on the decision of this first point. If the pledges were illegal, it seems that the defendant has funds which in equity and good conscience it must return to the plaintiffs, and the procedural and other difficulties concerning parties, a formal trust res, and so on, do not avoid that conclusion.

We consider, therefore, the substantial problem to be whether legislation of the Philippine Islands, known to, acquiesced in, and, as we think, approved by the Congress, as well as acted upon for many years by the executive departments of our government, constituted the necessary authorization. We are of the opinion that it did. Conceding, as we now must under the decisions cited, that a pledge by a national bank must be authorized by legislative act, it has not been unusual to provide such authorization. Thus Congress has granted the power in the case of public moneys of the United States where the bank in question has been properly designated a depositary (Act of Congress of March 3, 1901, 31 Stat. 1448, 12 U.S.C.A. § 90); public money of a state or its political subdivisions where state banks are empowered to secure such deposits (Act of Congress June 25, 1930, 46 Stat. 809, Idem); bankruptcy funds (Act of Congress July 1, 1898, 30 Stat. 562, 11 U.S.C.A. § 101; cf. 6 U.S.C.A. § 15); Indian moneys (Act of Con-

---

[3] The conflicting views as to the powers of both state and national banks, notably with respect to pledges to secure public funds, are referred to in McNair v. Knott, 302 U.S. 369, 371, 372, 58 S.Ct. 245, 82 L.Ed. 307. Cf. also Sneeden v. Marion, 7 Cir., 64 F.2d 721, 726, 730, affirmed in 291 U.S. 262, 54 S.Ct. 421, 78 L.Ed. 787; Pottorff v. El Paso-Hudspeth Counties Road Dist., 5 Cir., 62 F.2d 498; 79 U. of Pa. L. Rev. 608; 42 Harv. L. Rev. 292.

gress March 3, 1911, § 17, 36 Stat. 1070, 25 U.S.C.A. § 156); funds of insolvent national banks (Act of Congress May 15, 1916, 39 Stat. 121, 12 U.S.C.A. § 192); postal savings funds (Act of Congress May 18, 1916, § 2, 39 Stat. 159, 39 U.S.C.A. § 759); funds derived from the sale of public bonds (Act of Congress Sept. 24, 1917, § 8, 40 Stat. 291, 31 U.S.C.A. § 771); Puerto Rican funds (Act of Congress March 2, 1917, § 15, 39 Stat. 956, 48 U.S.C.A. § 780). Nor was there any strong or consistently followed policy against such pledges. "Agreements to secure public deposits did not violate any express statutory prohibition; no statute imposed a penalty for making such agreements." McNair v. Knott, 302 U.S. 369, 371, 58 S.Ct. 245, 247, 82 L.Ed. 307. Hence the Act of June 25, 1930, referred to above, which was designed to enable national banks to compete with state banks as to state deposits, was held to validate pledges previously made to secure such deposits likewise previously made. Id. and see also Lewis v. Fidelity & Deposit Co. of Maryland, 292 U.S. 559, 564, 565, 54 S.Ct. 848, 78 L.Ed. 1425, 92 A.L.R. 794.

Legislation of the Philippine Islands has authorized and required security for deposits of the Philippine Government placed in banking institutions of the United States for more than thirty years. The original Philippine Commission was instructed by Executive Order of April 7, 1900, to establish a civil government for the Philippine Islands subject to the approval and control of the Secretary of War. In the Philippine Organic Act of July 1, 1902, c. 1369, 32 Stat. 691, Congress "approved, ratified, and confirmed" the creation of the Philippine Commission and provided that until Congress should otherwise enact, the Islands should continue to be governed by the Commission. On October 12, 1907, the Philippine Commission enacted an extensive "Accounting Act," being Act No. 1792. Section 38 of that Act, after stating that the Governor-General might designate banking institutions in the Islands as depositaries of public funds and require security of them, continued:

"The Secretary of War may designate banking institutions in the United States as depositaries of the Government of the Philippine Islands, after they have filed in the Bureau of Insular Affairs of the War Department, Washington, District of Columbia, sufficient evidence of their sound financial condition and deposited bonds of the United States or of the Government of the Philippine Islands or other security satisfactory to the Secretary of War in such amounts as may be designated by him; and no banking institution shall be designated a depositary of the Government of the Philippine Islands until the foregoing conditions have been complied with." Public Laws of the Phil. Is., Vol. VI, pp. 475, 482–483.

This section remained in full force and effect until July 1, 1916, when the Philippine Administrative Code of 1916, adopted by the Third Philippine Legislature, became effective. Section 656 of that code contained a provision adopted from Section 38, supra, reading as follows:

"The Governor-General may appoint any bank or banking institution in the Philippine Islands, and the Secretary of War any similar institution in the United States, as a depositary of the Government of the Philippine Islands, after such institution has filed sufficient evidence of its sound financial condition and has deposited, as security, either in the Insular Treasury or in the Bureau of Insular Affairs at Washington, bonds of the United States or of the Government of the Philippine Islands or other bonds or securities satisfactory to and approved by the officer making the appointment and in such amount as shall be required by him [1792–38]." [4] The same provision was included as Section 625 of the Philippine Administrative Code of 1917, which is the present section and the one in force when all the pledges involved in these suits were made.[5]

Section 86 of the Organic Act of 1902, enacted by the Congress of the United States, provided that "all laws passed by the government of the Philippine Islands shall be reported to Congress, which * * * reserves the power and authority to annul * * *." 32 Stat. 712. Congress, however, never annulled either Sec-

---

[4] The numbers at the end of the statute show its origin from the Act of 1907, so numbered.

[5] Sec. 625 of the 1917 Code continues Sec. 656 of the previous code, in accordance with Sec. 3 of the 1917 Code to the effect that "such provisions of this code as incorporate prior laws shall be deemed to be made in continuation thereof and to be in the nature of amendments thereto."

tion 38 of Act No. 1792, enacted in 1907, Section 656 of the 1916 Code, or Section 625 of the 1917 Code, although they were regularly reported to it.[6]

In August, 1916, when Congress was considering the Philippine Autonomy or Jones Act, 39 Stat. 545, it had before it the whole of the 1916 Code,[7] but Section 656 was not repudiated. On the contrary, it provided in Section 6 of that Act that:

"The laws in force in the Philippines on August 29, 1916, shall continue in force and effect, except as altered, amended, or modified by this chapter, until altered, amended, or repealed by the legislative authority provided by this chapter or by Act of Congress of the United States." 39 Stat. 547, 48 U.S.C.A. § 1004.[8]

After the enactment of Section 38 of Act No. 1792 in 1907 by the Philippine Commission, and after the provisions of that section had been transmitted to it, Congress, on December 23, 1913, passed the original Federal Reserve Act, which provided in Section 15 that:

"No public funds of the Philippine Islands, or of the postal savings, or any Government funds, shall be deposited in the continental United States in any bank not belonging to the system established by this chapter." 38 Stat. 265; now found in 12 U.S.C.A. § 392.

At the time of the enactment of this section only national banks were automatically made members of the federal reserve system. As late as 1915, indeed, of the total member banks of the system, 7,605 were national banks and only 17 were state banks or trust companies. 1 Fed.Res.Bull. p. 29.

In 1917, there was enacted significant legislation as to deposits of Puerto Rico, cited above. By Act of Congress of March 2, 1917, § 15, 48 U.S.C.A. § 780, the Treasurer of Puerto Rico was authorized to designate United States depositaries which qualified and provided satisfactory security for Puerto Rican deposits. This act went so far as to commit the power of designation to the Territorial Treasurer, but, outside of that provision and necessary changes resulting from it and in its main enactment, this statute follows the language, even the punctuation, of Section 38 of Act No. 1792 of the Philippine Commission. It seems clear that the later act was drawn with the Philippine act as a model.

The interpretation of the executive departments charged with execution of the legislation is to the same effect. For over thirty years very large deposits of Philippine funds have been made with numerous national banks in the United States,[9] and during all of this time these funds were secured by pledges of bonds made by each of the depositary banks with the Bureau of Insular Affairs equivalent in face value to the amount of the deposits. Throughout this period no Comptroller of the Currency made any objection to any one in regard to this practice. On the contrary, when consulted by the Bureau of Insular Affairs in each of these very suits, with respect to the sale of the bonds after the banks had closed, the Comptroller's Office informed the Bureau of Insular Affairs that the Comptroller would not object to the sale of the bonds or other application of the proceeds to the claims of the Philippine Government against the banks for the funds deposited therein. Moreover, national bank examiners of the Comptroller's Office regularly reported on the pledges made by the various national banks to secure Philippine deposits; there was cor-

---

[6] 42 Cong. Rec. 475, 506 (1908); 53 Cong. Rec. 12,481, 12,510 (1916); 56 Cong. Rec. 62,101 (1917)—messages of the Presidents, the first transmitting to the Senate and House the annual Report of the Secretary of War for 1907, which set forth the legislation, the last two transmitting the sets of laws enacted by the Philippine Legislature in 1916 and 1917. Both the 1916 and 1917 Codes were printed as Senate Documents, the former as Sen. Doc. No. 529, 64th Cong., 1st Sess., the latter as Sen. Doc. No. 124, 65th Cong., 2d Sess. It was also shown in evidence that in 1910, the Chairmen of the Senate Committee on Military Affairs and the House Committee on Appro-

priations were informed by the Secretary of War as to the banks in which Philippine funds were deposited, the amounts on deposit, and that pursuant to the provisions of Sec. 38 all such deposits were secured.

[7] See note 6, just above.

[8] See committee reports, H.R.Rep.No. 499, 64th Cong., 1st Sess., April 6, 1916, p. 11; Sen.Doc.No. 530, 64th Cong., 1st Sess., Aug. 14, 1916, p. 3. Compare the present statute, 48 U.S.C.A. § 1245.

[9] At one time they totalled upwards of 86 million dollars, distributed among 45 national banks and 20 state banks in the United States.

respondence from an Acting Comptroller with the Bureau in 1912 resulting in a report as to the Philippine depositaries from the latter to the former; in 1913, the Secretary of the Treasury made specific recommendations to the Secretary of War as to such depositaries, referring to "the security required" of them; and it is clear that officials of the Treasury Department knew of the practice and assumed it to be entirely legal. Finally, it appeared that in March and April, 1934, in response to a request for an opinion with respect to the power of national banks to secure Philippine deposits, the Office of the Comptroller of the Currency advised the National Bank of Tulsa that national banks did have such power.

So far as the War Department and the Bureau of Insular Affairs are concerned, their continuous belief in the validity of these pledges and their solicitous regard for the interests of the Philippine Commonwealth, and hence of the defendant in these suits, have already been referred to. Indeed, of the two legislative bodies involved and of all the Philippine or United States Government officials charged with any responsibility in the premises, no one seems ever to have doubted or questioned the validity of these pledges until after the decisions of the United States Supreme Court in 1934. Whether all these persons were in error must turn upon the power and the intent of both Congress and the Philippine Legislature in taking the steps above recounted.

■ As to the power of Congress, its general authority to act in the premises, not merely with reference to national banks, but also with reference to an insular possession over which "the nation possesses the sovereign powers of the general government plus the powers of a local or a state government in all cases where legislation is possible" (Cincinnati Soap Co. v. United States, 301 U.S. 308, 317, 57 S.Ct. 764, 768, 81 L.Ed. 1122; cf. Inter-Island Steam Nav. Co. v. Territory of Hawaii, 305 U.S. 306, 59 S.Ct. 202, 206, 83 L.Ed. 189), is clear. The particular point is whether delegation of this power to the Philippine legislative bodies may be supported. Hence this question and that as to the power of the Philippine Legislature are identical. It has been held that in dealing with the Philippine Islands Congress may "delegate legislative authority to such agencies as it may select," and it may rati-

fy the acts of such agents as fully as if such acts had been specially authorized by a prior act of Congress. United States v. Heinszen & Co., 206 U.S. 370, 385, 27 S. Ct. 742, 746, 51 L.Ed. 1098, 11 Ann.Cas. 688; Dorr v. United States, 195 U.S. 138, 153, 24 S.Ct. 808, 49 L.Ed. 128, 1 Ann.Cas. 697; American Trading Co. v. H. E. Heacock Co., 285 U.S. 247, 256, 52 S.Ct. 387, 76 L.Ed. 740; cf. Simms v. Simms, 175 U.S. 162, 168, 20 S.Ct. 58, 44 L.Ed. 115. And the question of power is closely connected with that of intent, for Congress has the power to make "a void act of the territorial legislature valid, and a valid act void." Inter-Island Steam Nav. Co. v. Territory of Hawaii, supra [305 U.S. 306, 59 S.Ct. 206]. It is held, however, that mere failure to act under the power reserved to it does not make the territorial legislation an act of Congress. Miners' Bank v. Iowa, 12 How. 1, 53 U.S. 1, 7, 8, 13 L.Ed. 867; Springer v. Government of Philippine Islands, 277 U.S. 189, 208, 209, 48 S. Ct. 480, 72 L.Ed. 845; Maxwell v. Federal Gold & Copper Co., 8 Cir., 155 F. 110, 112; United States v. Bull, 15 Philippine 7. The question then depends upon the validity and intent of the original delegation of power.

■ Now it is clear that power to regulate the natural internal affairs of its constituency can be properly delegated to the territorial legislature. In Dorr v. United States, supra, a libel law enacted by the Philippine Commission was held valid; and in American Trading Co. v. H. E. Heacock Co., supra, a like conclusion was reached as to the Philippine Trade Mark Act. The line of demarcation between proper and improper delegation is pointed out in the decisions of the Supreme Court. In Springer v. Government of Philippine Islands, supra, the case chiefly relied on by the plaintiffs, it was held that an act of the Philippine Legislature, which attempted to take from the Governor-General powers expressly vested in him by the Organic Act of Congress, would not be deemed approved by failure of Congress to annul the same, because it was "clearly void as in contravention of the Organic Act." [277 U.S. 189, 48 S.Ct. 485, 72 L. Ed. 845.] Again in Posadas v. National City Bank, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351, an attempt of the Philippine Legislature to levy capital and deposit taxes against branches of a national bank ran counter to explicit legislation, as well

as the historic policy of the United States towards its banks. On the other hand, in Clinton v. Englebrecht, 13 Wall. 434, 80 U.S. 434, 446, 20 L.Ed. 659, where the court upheld an act of a territorial legislature (that of the territory of Utah as to summoning jurors), there was no such conflict. The court said: "The simple disapproval by Congress at any time, would have annulled it. It is no unreasonable inference, therefore, that it was approved by that body." Other instances of acquiescence by Congress in acts of territorial legislatures by failure to disapprove are found in Chuoco Tiaco v. Forbes, 228 U.S. 549, 558, 33 S.Ct. 585, 57 L.Ed. 960; Fajardo Sugar Co. v. Holcomb, 1 Cir., 16 F.2d 92, 96 (with further proceedings in 1 Cir., 27 F. 2d 13, certiorari denied, 278 U.S. 643, 49 S.Ct. 79, 73 L.Ed. 557); People of Porto Rico v. American R. Co. of Porto Rico, 1 Cir., 254 F. 369, 377, certiorari denied, 249 U.S. 600, 39 S.Ct. 259, 63 L.Ed. 796; Camunas v. Porto Rico Ry., Light & Power Co., 1 Cir., 272 F. 924, 931, appeal dismissed, 260 U.S. 700, 43 S.Ct. 91, 67 L. Ed. 470. Instances where Congress has specifically disapproved, in whole or in part, acts of territorial legislatures are found in First National Bank v. Yankton County, 101 U.S. 129, 25 L.Ed. 1046, and Late Corporation of the Church of Jesus Christ, Mormon Church v. United States, 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 481; cf. also Utter v. Franklin, 172 U.S. 416, 423, 19 S. Ct. 183, 43 L.Ed. 498.

We are brought therefore to the inquiry whether this legislation can be considered properly a regulation of the affairs of the territory, as distinguished from those of the country at large, and whether it violates any specific legislation or legislative policy of the Congress. As to the latter, it is quite clear from the several instances cited above where pledges by national banks have been authorized that it does not. Indeed, an opposite result would be definitely out of line with a well recognized policy, for it would give the state banks a monopoly upon Philippine deposits in this country, contrary to the established policy of placing the national banks on a competitive equality with state banks. McNair v. Knott, supra.[10] In-

deed, it would go still further and prefer the local banks in the Philippines to the branches of the national banks there, for the legislation in question is surely valid so far as it designates depositaries in the Islands themselves.

█ Plaintiffs claim, however, that legislation thus reaching to the mainland cannot be considered as properly a regulation of Philippine affairs. But we think under the circumstances this is too narrow a construction. Legislation affecting the government of the Islands is sure to have some repercussions on the mainland. That this was expected is shown by legislation restricting the authority granted in certain instances, as with respect to the tariff laws, immigration, the currency and coinage laws, which required the approval of the President of the United States. 48 U.S.C.A. § 1042. Involved in American Trading Co. v. H. E. Heacock Co., supra, was the famous and much litigated trade name of "1847, Rogers Bros.," originating in Meriden, Connecticut, for silver-plated ware; it failed of protection in the Islands for lack of prior registration under the Philippine Trade Mark Act. A workable distinction as to validity cannot be formulated in terms of physical operation or incidence of the legislation. Here, where the act deals with public functions of government, the test must be found in terms of its necessity or appropriateness for the fulfillment of these functions.

█ Now there can be little doubt that selection of a safe depositary for its funds is a necessary power to a government. That the power of designation should be extended to banks outside the Islands was natural and fitting, in view of the close relations between the Islands and the mainland and the large business transactions requiring the difficult and expensive task of continual intertransfer of funds between them unless national depositaries were chosen. Indeed, the beneficial nature of the arrangement to all concerned—the banks, the Philippine Government, and the Bureau of Insular Affairs in adjusting and making smooth the course of civil government in the Islands—was undoubtedly a reason not only for the original grant, but for the fact that it was not questioned until the present

[10] See also First Nat. Bank v. Fellows ex rel. Union Trust Co., 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233, L.R.A.1918C, 283, Ann.Cas.1918D, 1169, and State ex rel. Burnes Nat. Bank v. Duncan, 265 U.S. 17, 44 S.Ct. 427, 68 L.Ed. 881, dealing with the power of a national bank to act as executor or trustee under 12 U.S. C.A. § 248(k); and 12 U.S.C.A. § 36, as to branch banks of national banks.

suits. The regulation when enacted in 1907 itself appeared as part of an extensive system for control of the financial affairs of the new government, an "Accounting Act" "for a system of money and property accountability for the Government of the Philippine Islands and its subordinate branches" in 75 sections, dealing in great detail with such matters as the auditing of public accounts, the control of the disbursing of public funds, and the care of public property. The series of carefully prepared accounting acts, which were passed successively from 1902 on, for the care and control of Philippine public funds is listed in Wright v. Ynchausti & Co., 272 U.S. 640, 646, 47 S.Ct. 229, 71 L.Ed. 454. The very section here in question has obvious and direct local ramifications not merely in the part which provides for designation of depositaries within the Islands, but also and particularly in that which forbids designation of a bank as depositary—and therefore use of it as such by the Philippine Government—until the conditions have been complied with.

■ In view of the cherished purpose of this country to establish a stable government in the Philippines which should eventually be fitted for independence (as occurred in 1935), we think it improper to view these legislative acts as jealously as the courts can properly view a pledge for the benefit of a private corporation, as in Texas & Pacific R. Co. v. Pottorff, supra, or a local subdivision of a state where state banks lack a like power, as in Marion v. Sneeden, supra. The situation which this country faced as to the insular dominions under its suzerainty after the Spanish-American War was unique; and, judging by the present temper of our people, not likely to be repeated. Certainly invalidity should not be presumed or found unless no other reasonable course is necessary for transactions so much in line with both our domestic and our territorial policies and so long unquestioned. At this late date to discover defects undreamed of by our executive and legislative officers for more than a generation, which operate to the advantage of general and domestic creditors of these banks, is an act which is likely to seem inexplicable to the people whom we have chosen to befriend.

■ The conclusion that power exists to pass the legislation is supplemented and supported by the full showing of intent to that end on the part of both the Philippine Legislature and Congress here disclosed. If there was a doubt of the intent to delegate this power in the Organic Act of 1902, it would seem to have been resolved by the time of the Autonomy Act of 1916. Thereafter at least we think the point was clear. The contrary result requires a holding that only state banks could have accepted this profitable business. Plaintiffs concede that the statutes cited above confer on national banks the authority to pledge assets, although several are couched in general terms without reference to national banks as such. These include those statutes which apply to bankruptcy funds (at least formerly),[11] to Indian moneys, to postal savings, to sales of public bonds,[12] and to Puerto Rican funds. The general intent of the officials charged with the care of these funds and the interested congressional committees has been stated. It is no more conceivable in this case than in the other cases cited that Congress intended to stultify the national banks in their competition with state

---

[11] The statute 11 U.S.C.A. § 101, requiring security for the deposit of bankruptcy funds, was held to apply to national banks in Evans v. New Haven Bank, 2 Cir., 72 F.2d 664; the contrary was held in Phelps v. Citizens Union Nat. Bank, D.C.W.D.Ky., 13 F.Supp. 623, affirmed without discussion of this point in 6 Cir., 95 F.2d 763. The intent to make no discrimination against national banks would seem to be shown by the amendment of Aug. 23, 1935, c. 614, § 340, 49 Stat. 721, excepting from the requirement of security all such deposits insured by the Federal Deposit Insurance Corporation, 12 U.S.C.A. § 264. The point was put at rest, however, by the specific amendment of June 22, 1938, c. 575, § 1,

52 Stat. 872, expressly authorizing national banking associations designated as depositaries under the section to give such security as may be required. Moreover, all previous pledges for the purpose were "ratified, validated, and approved," a provision clearly unnecessary under McNair v. Knott, supra.

[12] The main enacting clause of the statute, 31 U.S.C.A. § 771, makes no specific reference to national banks; a proviso is to the effect that the reserves required to be kept by national banks and other member banks of the federal reserve system do not apply to deposits of public moneys by the United States in designated depositaries.

banks. Thus, at the time the Federal Reserve Act was passed, with its specific restriction of depositaries for these and other public funds to member banks, Congress surely did not intend to limit this business to the then practically nonexistent state bank members.

We conclude, therefore, that the pledges in question were authorized and valid. With this conclusion, the decisions of the Supreme Court relied on by the plaintiffs do not control, and another case pressed upon us—Inland Waterways Corp. v. Hardee, 69 App.D.C. 268, 100 F.2d 678—is not in point. The latter case held invalid pledges by a national bank to secure deposits of the United States Shipping Board Merchant Fleet Corporation or Inland Waterways Corporation, since these were not public moneys of the United States; it further held invalid such pledges to secure postal money order funds of the Canal Zone. As to the latter, it appeared that, although the Canal Zone Board was left free to make rules for the conduct of the postal money order system, no rule had been made requiring banks to give security for the deposits, and hence an act of Congress validating rules promulgated in the Canal Zone by authority of the President was ineffective to establish the legality of the pledges. The absence of any rule whatsoever is significant in a comparison of that case with the one before us here.

Affirmed.

L. HAND, Circuit Judge (concurring).

I feel too much doubt to concur in the proposition that Congress authorized federal banks to give security for Philippine deposits. That can only be spelled out with great doubt and by great indirection, when it would have been entirely simple to have stated it in a short sentence. The administrative interpretation does indeed count in its favor, and perhaps, if I were forced to decide, I might come to the same conclusion as my brothers; but it does not seem to me that I am. The action is for money paid to the plaintiff's use which is never recoverable unless it is due ex aequo et bono. The defendant had given its own bonds to the Philippine Government to secure its deposits and that government still holds them as security for the proceeds of these very bonds. There is no way in which the defendant can reclaim them without suit and it cannot sue a sovereign, just as it could not make it a party here.

It could of course refuse to honor cheques upon the deposit, but that would do it no good. The Philippine Government could indemnify itself by selling the defendant's bonds and the defendant would be helpless. It was in effect in the position of a bona fide purchaser; it received the bonds of the banks which the plaintiff represents or their proceeds, without notice of any claims against them, and by crediting them as a deposit to the Philippine Government it in substance created a lien upon its bonds pro tanto. I say that it created such a lien, not indeed because in law the defendant's bonds were any more charged than those of the banks which the plaintiff represents; but because that is the effect of the government's immunity. The plaintiff is by hypothesis entitled to the banks' bonds and the Philippine Government is under an obligation to deliver them. A recovery would mean that the defendant was compelled to discharge the government's obligation without recourse over to the primary obligor. As between the plaintiff and the defendant this is obviously a most unjust result, for the defendant never became a surety for the Philippine Government; any obligation from it to the plaintiff would have to be thrust upon it by reason of its innocent dealings with that government. For this reason I concur.